UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARTER COMMUNICATIONS, INC.,

                              Petitioner,

                    -v.-

KARIN GARFIN,

                              Respondent.

20 Civ. 7049 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Petitioner Charter Communications, Inc. ("Charter" or "Petitioner") filed a petition to compel arbitration (the "Petition"), pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4 (the "FAA"), against Respondent Karin Garfin.  Prior to the Petition, Respondent had filed a related action in state court (the "Underlying Action"), against Charter and Charter employees Kevin Dugan, Audrey Gruber, and Joi De Leon (the "Individual Defendants").  Charter removed the Underlying Action to this Court, where it was stayed pending the resolution of Charter's Petition.  For the reasons stated below, Charter's Petition is granted.

## BACKGROUND[1]

### A.  Factual Background

### 1.  The Parties

Petitioner is a telecommunications services company that is incorporated in Delaware with its principal executive offices in Stamford, Connecticut. (Petition ¶ 20).  Respondent is a resident of New York, New York.  (*Id.* at ¶ 21). For approximately four months in 2017, Respondent was employed by Petitioner in New York, New York, as a senior producer on the NY1 television show "On Stage."  (*Id.* at ¶ 25).  She was hired in or around June 2017, and her employment was terminated at some point between late September 2017 and November 2017.  (*Id.*; Garfin Decl. ¶¶ 2-3).[2]  Petitioner submits that

---

[1]  The facts contained in this Opinion are drawn from Charter's Petition to Compel Arbitration (the "Petition") (Dkt. #1), and the parties' submissions and accompanying exhibits in connection with the instant motion.

For ease of reference, Petitioner's Memorandum of Law in Support of Its Petition to Compel Arbitration is referred to as "Pet. Br." (Dkt. #6); Respondent's Memorandum of Law in Opposition to the Petition is referred to as "Resp. Opp." (Dkt. #27); and Petitioner's Reply Memorandum of Law in Further Support of its Petition to Compel Arbitration is referred to as "Pet. Reply" (Dkt. #28).  The declarations of attorneys and witnesses submitted in connection with the parties' opening and opposition briefing are referred to as "[Name] Decl."  The Declaration of Melissa C. Rodriguez submitted in support of Petitioner's reply briefing is referred to as "Rodriguez Reply Decl." (Dkt. #29). The JAMS Arbitration Agreement that was in effect as of June 2017, is referred to as the "JAMS Agreement" (Cassidy Decl., Ex. B).  The Solution Channel Agreement in effect as of October 6, 2017, is referred to as the "Solution Channel Agreement" (Fries Decl., Ex. B); and the October 6, 2017 email from Paul Marchand, Executive Vice President of Human Resources at Charter, announcing and distributing the Solution Channel Agreement, is referred to as the "Solution Channel Announcement" (Fries Decl., Ex. A).

References to filings on the Underlying Action docket will be referred to as "20 Civ. 7050 Dkt. #[number]."

[2]  Respondent claims that she was terminated by Charter on or about September 19, 2017, and that her last day of work at NY1 was on September 23, 2017, but that Charter continued to pay her for some time through the fall of 2017.  (Garfin Decl. ¶¶ 2-3).  Charter's Vice President of HR Technology has attested that Charter's electronic employee records system reflects that Respondent was an employee of Charter as of October 6, 2017.  (Fries Decl. ¶¶ 1, 10).

Plaintiff was terminated for unsatisfactory performance (Petition ¶ 25), while Respondent has alleged that she lost her job due to "her refusal to acquiesce" either to "her boss's sexual advances" or to the Individual Defendants' "discriminatory behavior toward other female employees at [Charter]" (Rodriguez Decl., Ex. M at ¶ 4).

### 2.    The Arbitration Agreements

Petitioner asserts that Respondent received two arbitration agreements during her employment at NY1: the first as a condition of her hiring, and the second towards the end of her term as an employee.  (Petition ¶¶ 3-4).  The Court will discuss each in turn.

### a.    The JAMS Agreement

Respondent's offer of employment with Petitioner was contingent upon her assent to the JAMS Arbitration Agreement (the "JAMS Agreement"). (Petition ¶ 3; JAMS Agreement 1).  Respondent electronically acknowledged and accepted the JAMS Agreement on June 13, 2017, as part of Charter's web-based "onboarding" process for her position.  (Cassidy Decl. ¶¶ 8-17).  The JAMS Agreement provided that: "any and all claims, disputes, and/or controversies between [Respondent] and Charter arising from or related to [Respondent's] employment with Charter shall be submitted exclusively to and determined exclusively by binding arbitration before a single Judicial Arbitration and Mediations Services, Inc. ('JAMS') arbitrator under the [FAA]." (JAMS Agreement 1).  The agreement provided that all arbitration proceedings would be conducted in accordance with the JAMS Employment Arbitration

Rules & Procedures and JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness.  (*Id.*).

### b.    The Solution Channel Announcement and Agreement

On October 6, 2017, Charter's Vice President of Human Resources distributed an email to certain employees announcing "Solution Channel," its internal employment-based legal dispute resolution and arbitration program (the "Solution Channel Announcement").  (Fries Decl. ¶¶ 5-6).  The email was sent to the work email addresses of all of Charter's non-union employees below the level of Executive Vice President.  (*Id.* at ¶ 6).  Respondent was among those included in this distribution list.  (*Id.* at ¶ 11; *see also id.*, Ex. C (October 6, 2017 email sent to Respondent)).  However, Respondent states that she was unable to access her work email account as of September 28, 2017, and did not receive any messages sent to that email address after September 2017. (Garfin Decl. ¶¶ 4-5).  In support, Respondent has submitted a cell phone screenshot, dated September 28, 2017, that appears to reflect a failed attempt to access the "On Stage NY1" account.  (*Id.*, App'x).  Specifically, the screenshot indicates that an "incorrect" password was entered, and includes a prompt for password reentry.  (*Id.*).

The Solution Channel Announcement explained that the new legal dispute and arbitration program would "resolve covered employment-related legal disputes through binding arbitration[,]" and that "by participating in [the program]" both the employees and Charter "waive[d] the right to initiate or participate in court litigation … involving a covered claim and/or the right to a

4

jury trial involving any such claim." (Solution Channel Announcement 1).  The announcement directed the email recipients to "more detailed information" about the program on Charter's internal systems.  (*Id.*).   And the announcement explained that unless the recipients "opt[ed] out" of participating in the program within "the next 30 days," they would be "enrolled" in the program.  (*Id.*).  Recipients were further directed to instructions for opting out of the program on Charter's internal systems.  (*Id.*).

Under the Solution Channel program, covered employees who did not affirmatively "opt out" agreed to the terms of a mutual arbitration agreement (the "Solution Channel Agreement").  The agreement covered:

> [A]ll disputes, claims, and controversies that could be asserted in court or before an administrative agency or for which [the employee] or Charter have an alleged cause of action related to pre-employment, employment, employment termination or post-employment-related claims ... , including without limitation claims for: ... unlawful discrimination or harassment (including such claims based upon race, color, national origin, sex, pregnancy, age, religion, sexual orientation, disability, and any other prohibited grounds)[.]

(Solution Channel Agreement ¶ B.1).  Unlike the JAMS Agreement, which covered only claims against Charter itself, the Solution Channel Agreement provided that employment disputes were covered "whether made against Charter, or any of its ... individual ... employees (in an official or personal capacity ... )."  (*Id.* at ¶ B.2; *see also* JAMS Agreement 1).  The agreement also stated that "all disputes related to the arbitrability of any claim or controversy" would be submitted to arbitration.  (Solution Channel Agreement ¶ B.3).

The Solution Channel Agreement provided that arbitration would be held before an arbitrator who was a current member of the American Arbitration Association (the "AAA").  (Solution Channel Agreement ¶ H).  The arbitration would be conducted pursuant to "Solution Channel Program Guidelines."  (*Id.*; *see also* Fries Decl., Ex. B).  The agreement itself provided: "This Agreement will be governed by the [FAA]."  (Solution Channel Agreement ¶ R).

Under the terms of the Solution Channel Agreement, employees agreed that Charter had offered "sufficient consideration" for the agreement, including "employment with Charter, and/or Charter's mutual agreement to arbitrate disputes."  (Solution Channel Agreement ¶ S).  Lastly for these purposes, the agreement stated that it "survive[d]" the termination of employment with Charter.  (*Id.* at ¶ T).

## B.   Procedural Background

### 1.   The 2019 State Court Action

On March 19, 2019, Respondent commenced an action in the Supreme Court of the State of New York, County of New York, against Petitioner and the Individual Defendants.  (Petition ¶ 5).  Respondent alleged that Defendants had engaged in sexual harassment and gender discrimination, created a hostile work environment, and retaliated against her in violation of the New York State Human Rights Law (the "NYSHRL") and the New York City Human Rights Law (the "NYCHRL").  (Rodriguez Decl., Ex. A at 1).  Petitioner's counsel informed Respondent's counsel that Respondent was bound to arbitrate her claims pursuant to the Solution Channel Agreement, and Respondent proceeded to

voluntarily discontinue the case in May 2019. (Petition ¶ 6; Goddard Decl. ¶¶ 3-4). Later that month, Respondent's counsel informed Petitioner's counsel that Respondent had not received the October 2017 Solution Channel Agreement, as Petitioner had "cut off" her email access on September 25, 2017. (Goddard Decl., Ex. 1 at 4). Petitioner's counsel responded that even if Respondent had not received the Solution Channel Agreement, she remained bound to arbitrate by the initial JAMS Agreement. (*Id.* at 2).

### 2.    The Arbitration Filings

The following year, on July 6, 2020, Respondent's counsel emailed Petitioner's counsel a Demand for Arbitration and a Statement of Claim (the "Demand"), and stated that the submissions would be filed with JAMS. (Petition ¶ 7). Respondent proceeded to submit the Demand to JAMS, but enclosed with her submission the Solution Channel Agreement, rather than the JAMS Agreement. (Duaban Decl. ¶ 4). As such, JAMS informed Respondent that they could not hear the matter, as the operative agreement appeared to require an AAA arbitration. (*Id.* at ¶ 5).

Respondent's counsel has since attested that submitting the Solution Channel Agreement to JAMS was one of several "mistakes" counsel made that were occasioned by various stresses during the ongoing COVID-19 pandemic. (*See* Duaban Decl. ¶¶ 3-12; Goddard Decl. ¶¶ 11-17). Specifically, Respondent's counsel, Megan Goddard, has stated that she was responsible for this matter until July 2020, when an associate at her firm, Saranicole Duaban, assisted with the filing of the initial JAMS arbitration while Ms. Goddard was

dealing with several medical issues.  (Goddard Decl. ¶¶ 11-12).  As a result of this transition, Respondent's counsel admits to having made several "mistakes" in the course of their submissions to arbitration.  (Duaban Decl. ¶¶ 3-12; Goddard Decl. ¶¶ 11-17).

On July 7, 2020, Ms. Duaban contacted Petitioner's counsel to explain that the filing with JAMS was "inadvertent," and that Respondent would be filing the Demand with the AAA the same day.  (Petition ¶ 8; Duaban Decl. ¶ 6). Counsel discussed the matter on a telephone call the same day, and Petitioner's counsel informed Ms. Duaban that pursuant to the Solution Channel Agreement that Ms. Duaban had enclosed with her submission to JAMS, Respondent was required to first submit her claim through Petitioner's internal Solution Channel dispute resolution program, rather than filing directly with the AAA.  (Petition ¶ 9; Duaban Decl. ¶ 7).  Ms. Duaban proceeded to submit Respondent's Statement of Clam through the Solution Channel program later that day.  (Duaban Decl. ¶ 10).  Ms. Duaban has attested that at the time, she was unaware that her colleague, Ms. Goddard, had taken the position with Petitioner's counsel that Respondent was not bound by the Solution Channel Agreement.  (*Id.* at ¶¶ 8-9, 11-12).

Following Petitioner's review of Respondent's claim through its internal Solution Channel program (Petition ¶ 11), on July 31, 2020, Petitioner contacted Respondent to state that it "denie[d] the allegations of any wrongdoing" and indicated that Respondent should determine whether she "wish[ed] to seek further review of [her] claim" (Rodriguez Decl., Ex. F).  Ms.

Duaban responded: "We'd like to request arbitration of our client Karin Garfin's claims." (*Id.*).[3]

On August 4, 2020, Petitioner submitted Respondent's Demand to the AAA, initiating arbitration proceedings. (Petition ¶ 12). Ms. Duaban acknowledged receipt of the Demand sent to the AAA. (*Id.*; *see also* Rodriguez Decl., Ex. H). On August 13, 2020, the AAA contacted counsel for Petitioner and Respondent confirming receipt of the Demand, and providing case initiation materials, as well as deadlines for next steps. (Petition ¶ 13). The same day, the AAA sent Petitioner an invoice for its case management fee, which Petitioner paid. (*Id.*).

Ms. Duaban submits that only after the initiation of the AAA proceedings did she learn that her colleague, Ms. Goddard, had taken the position with Petitioner's counsel that Respondent was not bound by the Solution Channel Agreement. (Duaban Decl. ¶¶ 11-12). Accordingly, on August 26, 2020, Ms. Duaban contacted the AAA and Petitioner, informing them that Respondent

---

[3]     Respondent's counsel submits that, given the parties' initial discussions about the Solution Channel Agreement in 2019, Petitioner's counsel was aware that Respondent had previously taken the position that she was not bound by the Solution Channel Agreement. (Duaban Decl. ¶¶ 8-9). Respondent's counsel's view is that Petitioner's counsel failed to "extend the courtesy" of reminding Respondent of her prior position. (*Id.* at ¶¶ 8-9).

Petitioner responds that Respondent's counsel made the determination that they had "inadvertently" filed with JAMS and would instead be filing with the AAA. (Pet. Reply 3 (quoting Rodriguez Decl., Ex. D)). Additionally, Petitioner asserts that Ms. Goddard remained involved in the decision to pursue arbitration before the AAA. (*Id.* at 3-4). In support, Petitioner has submitted correspondence from July 31, 2020, and August 2, 2020, between Ms. Goddard and Petitioner's counsel, in which Ms. Goddard inquired about the impact of Respondent's submission to the Solution Channel program on the tolling of her claims, stating, among other things: "I need an answer to this question today in order to make our decision." (Rodriguez Reply Decl., Ex. C at 1-2).

would not be participating in the arbitration "because there [was] no agreement between the parties to arbitrate at AAA, and even if there were, any such agreement would be null and void."  (Rodriguez Decl., Ex. K at 1).  Ms. Duaban stated that Respondent had not received, nor been "given the opportunity to opt-out of," the Solution Channel Agreement because it was sent to her work email account at a time when she no longer had access to that account.  (*Id.*).  Further, Ms. Duaban argued that the agreement was "null and void" under amended New York state regulations as interpreted in a recent decision by the Supreme Court of the State of New York, County of New York.  (*Id.* (citing N.Y. C.P.L.R. § 7515(b)(iii); *Newton* v. *LMVH Moët Hennessy Louis Vuitton Inc.*, Index No. 154178/2019, 2020 WL 3961988 (N.Y. Sup. Ct. July 10, 2020))).

### 3.    The Underlying Action and the Instant Case

On August 26, 2020, the same day that Respondent withdrew from the AAA arbitration proceedings, Respondent commenced a second action in the Supreme Court of the State of New York, County of New York, against Petitioner and the Individual Defendants (the "Underlying Action").  (Petition ¶ 16).  Respondent's Complaint closely tracks her initial Demand.  (*Compare* Rodriguez Decl., Ex. C, *with id.*, Ex. M).  Respondent alleges that Petitioner and the Individual Defendants violated the NYSHRL and the NYCHRL by subjecting Respondent to a hostile work environment, discrimination on the basis of her sex and gender, and retaliation following her reports of and objection to the discrimination directed at her.  (*Id.*, Ex. M at ¶¶ 240-57).

On August 31, 2020, Petitioner removed the Underlying Action to this Court. (20 Civ. 7050 Dkt. #1). The same day, Petitioner commenced the instant matter by filing the Petition and supporting memorandum of law and declarations. (Dkt. #1-5). The Court subsequently accepted the cases as related. At a conference held on September 11, 2020, the Court set a briefing schedule on the Petition, and stayed the Underlying Action pending the resolution of the Petition. (*See* Dkt. #19 (transcript)). Respondent subsequently requested, and was granted, an extension of time to submit her response to the Petition. (Dkt. #21, 23). Respondent submitted briefing and declarations in opposition to the Petition on November 13, 2020 (Dkt. #24-27), and Petitioner submitted its reply briefing and a supporting declaration on December 11, 2020 (Dkt. #28-29). The Petition is now ripe for consideration.

## DISCUSSION

### A.    Applicable Law

#### 1.    Petitions to Compel Arbitration Under the FAA

The FAA "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted). Section 2 of the FAA provides that "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA allows a party to such an

agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of an arbitration agreement. *Id.* § 4. A court ruling on a petition to compel arbitration must decide two issues: (i) whether the parties agreed to arbitrate, and, if so, (ii) whether the scope of that agreement encompasses the claims at issue. *See Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).

A court resolving a motion to compel arbitration applies a standard similar to that for summary judgment. *Meyer*, 868 F.3d at 74 (quoting *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). In doing so, "the court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation marks, alterations, and citations omitted). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala.* v. *Randolph*, 531 U.S. 79, 91 (2000). A party opposing arbitration may not satisfy this burden through "general denials of the facts on which the right to arbitration depends"; in other words, "[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co.* v. *Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

In accordance with the "strong federal policy favoring arbitration as an alternative means of dispute resolution," a court must resolve any doubts concerning the scope of arbitrable issues "in favor of arbitrability." *Daly* v. *Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *State of N.Y.* v. *Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)), *cert. denied*, 140 S. Ct. 1117 (2020). In so doing, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal quotation marks and citation omitted).

### 2.    Choice of Law

Whether parties agreed to arbitrate is determined under state law. *See Bell* v. *Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an agreement to arbitrate is a creature of contract … the ultimate question of whether the parties agreed to arbitrate is determined by state law."). As jurisdiction in this matter is premised on diversity of citizenship (*see* Petition ¶ 22), the Court applies New York choice-of-law rules. *See Fieger* v. *Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."). "Under New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented." *Fed. Ins. Co.* v. *Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (citing *Fieger*, 251 F.3d at 393). "If not, no choice of law analysis is necessary." *Id.*

Petitioner and Respondent have presented a narrow question about the extent to which the FAA preempts recently-amended New York law on mandatory arbitration agreements, which question the Court will address in due course.  (*See* Pet. Br. 10 n.3; Resp. Opp. 10).  In support of its position on this issue, Petitioner argues that the arbitration dispute is governed by the FAA as it involves "interstate commerce." (Pet. Br. 10 n.3).  The FAA "applies in federal court to diversity suits which relate to contracts involving interstate or international commerce." *David L. Threlkeld & Co.* v. *Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 249 (2d Cir. 1991) (citing *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967)).  Petitioner argues that the FAA applies here because arbitration agreements covering employment relationships necessarily involve interstate commerce (Pet. Br. 10 n.3 (citing *Zendon* v. *Grandison Mgmt., Inc.*, No. 18 Civ. 4545 (ARR) (JO), 2018 WL 6427636, at *1 n.1 (E.D.N.Y. Dec. 7, 2018))), and because certain of Respondent's allegations implicate conduct that occurred across state lines — specifically between New York and Connecticut (*id.*; *see also* Rodriguez Decl., Ex. M at ¶¶ 90-98).  Petitioner also notes that it is not a citizen of New York. (Pet. Br. 10 n.3).

To the extent Petitioner's position is understood as an argument that federal common law provides the relevant substantive law, the Court understands that "the balance of more recent Second Circuit case law" suggests that courts "should apply state-law [rather than the FAA] to the question of whether a party is bound by a purported agreement to arbitrate."

14

*Dynamic Int'l Airways, LLC* v. *Air India Ltd.*, No. 15 Civ. 7054 (PKC), 2016 WL 3748477, at *4 (S.D.N.Y. July 8, 2016) (collecting cases); *see also Progressive Cas. Ins. Co.* v. *C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) (observing that while the FAA "preempts state law which treats arbitration agreements differently from any other contracts, it also 'preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate'" (quoting *Cook Chocolate Co.* v. *Salomon, Inc.*, 684 F. Supp. 1177, 1182 (S.D.N.Y. 1988))).  The Court will thus apply state law to the contract formation issues presented in this case, though it will "bear[] in mind the presumptions provided by the FAA." *Dynamic Int'l Airways, LLC*, 2016 WL 37488477, at *4 (applying state law to formation of contract issues where jurisdiction was premised on diversity).[4]

Neither party suggests that the Court should apply the law of a state other than New York.  *See Fed. Ins. Co.*, 639 F.3d at 566 ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.").  New York courts apply an "interest analysis" to choice of law issues involving contractual disputes, whereby, "the law of the jurisdiction having the greatest interest in the litigation will be applied." *Progressive Cas. Ins. Co.*, 991 F.2d at

---

[4]     Petitioner cites to *Zendon* v. *Grandison Mgmt., Inc.*, No 18 Civ. 4545 (ARR) (JO), 2018 WL 6427636, at *1 n.1 (E.D.N.Y. Dec. 7, 2018), but that case does not compel a different result.  *Zendon* considered an argument from the party opposing arbitration that the FAA had no application because there was no agreement in writing between the parties to arbitrate their disputes.  *Id.*  Here, the Court agrees that the FAA "provides the overarching framework" for adjudicating the Petition, but applies state law to questions of contract formation, consistent with Second Circuit law.  *See Dynamic Int'l Airways, LLC* v. *Air India Ltd.*, No. 15 Civ. 7054 (PKC), 2016 WL 3748477, at *4 (S.D.N.Y. July 8, 2016).

46 n.6.  While nine of the paragraphs in Respondent's 60-page Complaint reference conduct that took place either in, or en route to or from, Connecticut (*see* Rodriguez Decl., Ex. M at ¶¶ 90-98), the Court observes that: (i) Respondent resides in New York (*id.* at ¶ 6); and (ii) the vast majority of Respondent's underlying allegations involve acts or omissions that took place in New York (*see generally id.*).  Thus, New York is the jurisdiction with the greatest interest in the matter, and the Court will apply New York law to the contract formation issues in this case.  *Cf. Progressive Cas. Ins. Co.*, 991 F.2d at 46 n.6 (applying New York law where the parties had different domiciles but the relevant policy was signed in New York and required that the underlying claim be presented in New York); *Thompson* v. *Body Sculpt Int'l, LLC*, No. 18 Civ. 1001 (ARR) (GRB), 2018 WL 3235545 at *3 n.3 (E.D.N.Y. July 2, 2018) (applying New York law where the majority of plaintiffs' work took place in New York, and one plaintiff resided in New York, though the remaining parties resided in other states).

Under New York law, the party seeking arbitration must prove by a preponderance of the evidence that a valid arbitration agreement exists.  *See Progressive Cas. Ins. Co.*, 991 F.2d at 46.  A valid arbitration agreement requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement[.]"  *In re Express Indus. & Terminal Corp.* v. *N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999).  By signing a written instrument, a party creates presumptive evidence of its assent to enter into a binding agreement.  *See, e.g., Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d

16

144, 149 (2d Cir. 2004); *Gillman* v. *Chase Manhattan Bank*, 73 N.Y.2d 1, 11 (1988) (holding that a party's signature generally creates a presumption that the party assented to the terms of the agreement).

## B.   Analysis

### 1.   The Parties Agreed to Arbitrate

Both parties appear to be in agreement that Respondent may be bound to arbitrate her claims against Petitioner under the JAMS Agreement (Pet. Br. 9-10; Resp. Opp. 13), though Respondent submits that she should be permitted to proceed with her Underlying Action against the Individual Defendants (Resp. Opp. 13). Petitioner disagrees, and argues in the first instance that Respondent should be compelled to arbitrate all of her claims before an AAA arbitrator pursuant to the Solution Channel Agreement. (Pet. Br. 7-9). In this regard, Petitioner asserts that Respondent received and assented to the agreement, but that even had she not, she demonstrated her agreement through her conduct. (*Id.*). Respondent raises a number of arguments in response, including that she did not agree to the Solution Channel Agreement (Resp. Opp. 4-6), and that the Solution Channel Agreement is invalid (*id.* at 6-8).

The parties agree that Respondent is bound to arbitration; at its core, their disagreement is over the forum for such arbitration and the scope of the claims subject to arbitration. And because the parties do not dispute the validity and scope of the JAMS Agreement as it pertains to Respondent's claims against Petitioner, the Court focuses in this Opinion principally on the Solution

Channel Agreement.  The Court concludes that Respondent agreed to arbitrate against Petitioner pursuant to the Solution Channel Agreement.  However, the Court is unable to resolve the parties' core dispute — arbitration pursuant to the JAMS Agreement or arbitration pursuant to the Solution Channel Agreement — and an arbitrator will thus need to determine the forum and scope of the claims subject to arbitration.

### a.    Respondent Agreed to Arbitration Under the Solution Channel Agreement

Respondent submits that she did not receive the Solution Channel Agreement, as she was effectively terminated from NY1 at the time of its email distribution and was unable to access her work email.  (Resp. Opp. 4; *see also* Garfin Decl. ¶¶ 4-5).  In support, Respondent put forth a mobile phone screenshot reflecting a prompt to re-enter a password to access an account labeled "On Stage NY1."  (Garfin Decl., App'x).  While Petitioner questions the significance of the screenshot submitted by Respondent (*see* Pet. Reply 5 n.3 (referencing Garfin Decl., App'x)), it argues that Respondent nonetheless demonstrated her assent to the Solution Channel Agreement through the actions of her counsel, which actions included: (i) informing Petitioner that she intended to file her Demand with the AAA; (ii) participating in the Solution Channel internal review process; and (iii) following the Solution Channel internal review, confirming that she wished to proceed with arbitration.  (*Id.* at 3-4; Pet. Br. 7-9).

"[B]racketing the question of whether [Respondent] *expressly* bound [herself] to the [Solution Channel Agreement] … by affirmatively agreeing to

18

and accepting the Agreement's terms and conditions," the Court finds that Respondent has "at least *impliedly* agreed to arbitrate" her claims against Petitioner and has "waived [her] rights to object to proceeding with the [a]rbitration." *Clarke* v. *Upwork Glob., Inc.*, No. 17 Civ. 560 (AJN), 2017 WL 1957489, at *6 (S.D.N.Y. May 10, 2017) (internal quotation marks and alterations omitted).  Under New York and federal law, "[a]lthough a party is bound by an arbitral award only where it has agreed to arbitrate, an agreement may be implied from the party's conduct." *Gvozdenovic* v. *United Air Lines, Inc.,* 933 F.2d 1100, 1105 (2d Cir. 1991); *see also In re Nat'l Cash Register Co. (Wilson)*, 8 N.Y.2d 377, 382 (1960); *cf. Kamakazi Music Corp.* v. *Robbins Music Corp.,* 684 F.2d 228, 231 (2d Cir. 1982) ("[I]t is hornbook law that parties by their conduct may agree to send issues outside an arbitration clause to arbitration.").  Thus, even where a party is "not contractually bound" to participate in arbitration, it "may waive its right to object to going forward with an arbitration" "through its conduct." *Sands Bros. & Co.* v. *Zipper*, No. 03 Civ. 7731 (VM), 2003 WL 22439789, at *1 (S.D.N.Y. Oct. 27, 2003).  Specifically, a party may be found to have waived its right to object to arbitration if it participates in arbitration proceedings "without making a timely objection to the submission of the dispute to arbitration[.]" *Opals on Ice Lingerie* v. *Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003); *see also In re McNulty*, 575 N.Y.S.2d 351, 352 (2d Dep't 1991) ("By participating in the arbitration proceedings prior to moving for a stay, the petitioner has waived his objections thereto[.]" (internal citations omitted)); *Mufale* v. *Romeo*, 504 N.Y.S.2d 933, 934

19

(4th Dep't 1986) (finding that participation in the arbitration process served as waiver of right to apply for stay of arbitration).

In support of its argument that Respondent has waived her right to object to arbitration proceedings, Petitioner cites cases in which arbitration proceedings had progressed further, and involved more extensive participation by the parties, than the AAA arbitration initiated here.  (Pet. Br. 8).  *See Gvozdenovic*, 933 F.2d at 1104-05 (plaintiffs sent representative to act on their behalf in arbitration, and representative participated in arbitration hearing); *Clarke*, 2017 WL 1957489, at *6 (plaintiffs "appeared, either in person or through a representative, [for] at least two Arbitration conferences before a designated arbitrator," and one plaintiff "expressly advised" the arbitrator that plaintiffs "did not object to arbitration" and consented to expedited proceedings and entry of a discovery schedule and hearing date (emphasis omitted)); *Merrill Lynch & Co.* v. *Optibase, Ltd.*, No. 03 Civ. 4191 (LTS) (FM), 2003 WL 21507322, at *3 (S.D.N.Y. June 30, 2003) (plaintiff affirmatively sought adjudication of certain claims in arbitration and pursued discovery in that forum).  Here, though Petitioner submitted Respondent's Demand to the AAA at Respondent's direction, and paid the AAA's case initiation fee, the Court's understanding is that the parties undertook no further meaningful steps in the proceedings prior to Respondent's withdrawal.  (Petition ¶¶ 11-14).

That being said, cases where a party has retained viable objections to an arbitration proceeding "turn in significant part on the relevant party making its resistance to arbitration expressly known early and often, whether by formal

objection, motion practice, or otherwise." *Clarke*, 2017 WL 1957489, at *6 (collecting cases); *cf. Home Mut. Ins. Co.* v. *Springer*, 515 N.Y.S.2d 76, 76 (2d Dep't 1987) (finding that party waived right to object to arbitration "by filing a notice of appearance and participating in the selection of an arbitrator and the scheduling of the arbitration hearing"). Given that Respondent informed Petitioner she intended to file her Demand with the AAA, submitted her claims to Petitioner's internal pre-arbitration dispute resolution program, subsequently directed Petitioner to commence arbitration before the AAA, and withdrew from arbitration several weeks after her Demand had been submitted to the AAA, she cannot be said to have timely objected to arbitration. (*See* Petition ¶¶ 7-14). *Cf. Morse* v. *Levine*, No. 19 Civ. 6711 (GHW) (SN), 2019 WL 7494619, at *5 (S.D.N.Y. Dec. 19, 2019) ("The parties' activity — such as Petitioners' filing a demand to arbitrate and Respondent's engagement with the AAA over the applicable rules — demonstrates both parties' intent to arbitrate issues relating to the Agreement."), *report and recommendation adopted*, No. 19 Civ. 6711 (GHW), 2020 WL 85410 (S.D.N.Y. Jan. 3, 2020)*; Pupiales* v. *BLDG Mgmt. Co.*, 2 N.Y.S.3d 798, 798-99 (1st Dep't 2015) (finding that plaintiff waived any objection to arbitration where her union commenced arbitration proceedings on her behalf).[5]  As such, even if Respondent did not

---

[5]     Respondent requests that this Court refrain from finding that she assented to arbitrate because of the "mistakes" of her counsel in requesting arbitration with the AAA. (Resp. Opp. 4; Garfin Decl. ¶¶ 10-11; *see also* Goddard Decl. ¶¶ 11-17; Duaban Decl. ¶¶ 3-12). However, it has long been established that a litigant "is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link* v. *Wabash R.R. Co.,* 370 U.S. 626, 634 (1962) (quoting *Smith* v. *Ayer,* 101 U.S. 320, 326 (1879)). Ms. Goddard and Ms. Duaban were Respondent's agents for the purpose of "making, or declining to make, objections [to

enter into the Solution Channel Agreement when it was distributed to Petitioner's employees via the Solution Channel Announcement on October 6, 2017,[6] she later impliedly consented to arbitration under the terms of that agreement.

### b.      The Solution Channel Agreement Is Not Invalid

Respondent proffers two alternate grounds for this Court to invalidate the Solution Channel Agreement.  She argues that Petitioner's failure to alert its employees to "material changes" between the JAMS Agreement and the Solution Channel Agreement rendered the latter agreement procedurally unconscionable, and further, that there was no valid consideration for the Solution Channel Agreement.  (Resp. Opp. 6-7).  The Court will address each in turn.

---

arbitration] on [Respondent's] behalf." *York Rsch. Corp.* v. *Landgarten*, 927 F.2d 119, 122 (2d Cir. 1991).  "To hold otherwise would invite chaos."  *Id.*

[6]    Under New York law, it is presumed that a party has received an email when it is delivered to the party's email address in accordance with regular office procedures.  *See Clearfield* v. *HCL Am. Inc.*, No. 17 Civ. 1933 (JMF), 2017 WL 2600116, at *2 (S.D.N.Y. June 15, 2017); *see also Meckel* v. *Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985). However, a party can rebut this presumption by producing admissible evidence showing that the email was not sent or was not received.  *See Lockette* v. *Morgan Stanley*, No. 18 Civ. 876 (JGK), 2018 WL 4778920, at *4 (S.D.N.Y. Oct. 3, 2018); *cf. Weiss* v. *Macy's Retail Holdings, Inc.*, 741 F. App'x 24, 28 (2d Cir. 2018) (summary order) (concluding that plaintiff defeated New York's mailing presumption by "provid[ing] evidence of his family's regular procedure for reviewing with him the mail he received and assert[ing], with sworn support, that the relevant mailings did not arrive and go through that process").  A plaintiff's mere denial of receipt of an email is insufficient.  *Lockette*, 2018 WL 4778920, at *4.  Here, Petitioner has submitted evidence that the email was addressed and delivered to Respondent's work email address.  (Fries Decl. ¶¶ 10-11; *id.*, Ex. C).  Respondent has in turn provided more than a mere denial of receipt; she has submitted a screenshot purportedly demonstrating that she was unable to access her work email account eight days before Petitioner distributed the Solution Channel Agreement.  (Garfin Decl., App'x).  Because the Court has determined that Respondent impliedly assented to arbitration under the Solution Channel Agreement, it need not determine whether Respondent's proffered evidence is sufficient to rebut the presumption of receipt.

22

###### i.        Procedural Unconscionability

Respondent argues that Petitioner was required to notify its employees of certain changes between the JAMS Agreement and the Solution Channel Agreement, including that the arbitral forum changed from JAMS to AAA, and that the Solution Channel Agreement expressly required arbitration of claims against individual officers and employees.  (Resp. Opp. 6-7).  She submits that the failure of the Solution Channel Announcement to alert employees to the broadened scope of claims subject to arbitration is a "clear indication of procedural unconscionability."  (*Id.*).

In general, a contract provision may be deemed unenforceable on unconscionability grounds "only where it is 'both procedurally and substantively unconscionable when made.'"  *Spinelli* v. *Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *Gillman*, 73 N.Y.2d at 10).  The New York Court of Appeals has explained that "[t]he procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice."  *Gillman*, 73 N.Y.2d at 10-11.  This examination involves a consideration of factors, including "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."  *Id.* (internal citations omitted).

Respondent refers the Court to a single case in which the court determined that the arbitration agreement at issue was "tainted by procedural

unconscionability" where the employer failed to alert employees that the new agreement's scope had expanded from stock-related disputes to all disputes. *Chen-Oster* v. *Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 248-49 (S.D.N.Y. 2020).  However, even in *Chen-Oster*, the court found that the arbitration agreement was enforceable *despite* its procedural unconscionability, as it was not substantively unconscionable.  449 F. Supp. 3d at 252; *see also Zam & Zam Super Market, LLC* v. *Ignite Payments, LLC*, 736 F. App'x 274, 277 (2d Cir. 2018) (summary order) ("A contractual provision will be deemed unenforceable on unconscionability grounds only where it is both procedurally and substantively unconscionable, meaning that the provision is so grossly unreasonable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms[.]" (internal citations and quotation marks omitted)).  Respondent does not argue that the arbitration clause of the Solution Channel Agreement was substantively unconscionable, and the Court sees no basis to find that the provision is "grossly unreasonable."  *Zam & Zam Super Market, LLC*, 736 F. App'x at 276; *see, e.g.*, *Brundage* v. *Pension Assocs. Ret. Planning, LLC*, No. 18 Civ. 2473 (NSR), 2019 WL 2465146, at *5 (S.D.N.Y. June 13, 2019) (finding arbitration clause not substantively unconscionable where it "applie[d] equally" to both parties and neither "prohibit[ed] Plaintiffs from initiating arbitration" nor "provide[d] Defendant with special rights withheld from Plaintiffs"); *Desiderio* v. *Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999) (declining to find

unconscionability where the agreement "binds *both* parties to mandatory arbitration and may not be said to favor the stronger party unreasonably"). Accordingly, the Solution Channel Agreement is not unenforceable on these grounds.[7]

### ii.     Consideration

Respondent next argues that the Solution Channel Agreement is invalid due to lack of consideration.  (Resp. Opp. 7.)  Because she had been terminated from her position at NY1 at the time the agreement was distributed, Respondent argues, she was offered neither employment nor anything additional that could be viewed as consideration.  (*Id.*).

The Solution Channel Agreement mutually binds both parties to submit covered claims exclusively to arbitration.  (Solution Channel Agreement ¶ B.1). Respondent herself acknowledges that courts have found that mutual arbitration provisions can constitute sufficient consideration to support an arbitration agreement.  (Resp. Opp. 7).  *See Bassett* v. *Elec. Arts, Inc.*, 93 F. Supp. 3d 95, 104 (E.D.N.Y. 2015); *see also Marciano* v. *DCH Auto Grp.*, 14 F. Supp. 3d 322, 337 (S.D.N.Y. 2014) (collecting cases finding that a mutual

---

[7]     Further, the Court observes that the Solution Channel Announcement notified employees that: (i) covered employment-related disputes would be subject to binding arbitration; and (ii) unless employees opted out, they would be enrolled in the program in the next 30 days; and (iii) directed employees to additional information about the program and instructions for opting out.  As such, the Court doubts that the arbitration provision could be deemed procedurally unconscionable.  *See Lockette*, 2018 WL 4778920, at *4 (finding notice of expanded arbitration provision sufficient where it notified employees that: "[i] all covered claims by employees … would be subject to mandatory arbitration; [ii] unless employees opted out … their continued employment would be considered assent to the program; and [iii]] they could opt out by submitting a form before the program's effective date.").

arbitration provision suffices as consideration).  However, Respondent argues

that because she had agreed to arbitrate her claims pursuant to the earlier

JAMS Agreement, the Solution Channel Agreement offered Respondent no

additional consideration.  (Resp. Opp. 7).  Respondent cites to no case law in

support of this argument.

The Court observes that under New York law, employers are not required

to provide additional consideration for agreements to arbitrate disputes entered

into post-hiring.  *See Metzler* v. *Harris Corp.*, No. 00 Civ. 5847 (HB), 2001 WL

194911, at *5 (S.D.N.Y. Feb. 26, 2001) ("[I]t is now the law in New York that a

court will compel arbitration even where an at-will employee was given no

additional consideration for the insertion of an arbitration clause in his

contract."); *see also Ahing* v. *Lehman Bros.*, No. 94 Civ. 9027 (CSH), 2000 WL

460443, at *7 (S.D.N.Y. Apr. 18, 2000) (observing that continuation of

employment is sufficient, without additional consideration, "to support a new

post-employment promise made by that employee").  However, at least one

court in this District has declined to determine whether an arbitration

agreement signed after a party's employment had ended provided adequate

consideration*, see Solis* v. *ZEP LLC*, No. 19 Civ. 4230 (JGK), 2020 WL 1439744,

at *6 n.3 (S.D.N.Y. Mar. 24, 2020), though the court acknowledged that in

certain circumstances, mutual promises to arbitrate claims can suffice as

consideration, *id.* (citing *Marciano*, 14 F. Supp. 3d at 337).  While Respondent

argues that the Solution Channel Agreement was distributed after she had

been effectively terminated by Petitioner (Resp. Opp. 4-5), she nonetheless

continued receiving the benefit of Petitioner's mutual obligation to arbitrate any claims against her.  *Cf. Chung Chang* v. *Warner Bros. Ent., Inc.*, No. 19 Civ. 2091 (LAP), 2019 WL 5304144, at *3 (S.D.N.Y. Oct. 21, 2019) (finding that arbitration clause survived terminated employment agreement where employee received continued consideration from employer's mutual arbitration obligation).  The Court concludes that the Solution Channel Agreement was supported by adequate consideration.

### 2. The Parties' Dispute Falls Within the Scope of the Solution Channel Agreement

Having found the Solution Channel Agreement to be valid and enforceable, the Court next considers whether its arbitration clause is applicable.  Courts generally construe arbitration clauses broadly.  *See, e.g.*, *McMahan Sec. Co. L.P.* v. *Forum Cap. Mkts. L.P.*, 35 F.3d 82, 88 (2d Cir. 1994) ("[F]ederal policy favoring arbitration requires us to construe arbitration clauses as broadly as possible[.]" (internal quotation marks omitted)); *accord Collins & Aikman Prods. Co.* v. *Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995). That is particularly true where the agreement itself uses broad language to define the scope of arbitration, which language "creates a presumption of arbitrability."  *Smith/Enron Cogeneration Ltd. P'ship* v. *Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2d Cir. 1999) (quoting *WorldCrisa Corp.* v. *Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)).  That presumption "is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Id.* (quoting *WorldCrisa Corp.*, 129 F.3d at 74)).

27

Under the Solution Channel Agreement, Respondent must arbitrate "*all disputes* … related to pre-employment, employment, employment termination or post-employment-related claims." (Solution Channel Agreement ¶ B.1 (emphasis added)). Further, the arbitration clause includes a non-exhaustive list of arbitrable claims, including disputes related to "unlawful discrimination or harassment (including such claims based upon race, color, national origin, sex, pregnancy, age, religion, sexual orientation, disability, and any other prohibited grounds)[.]"

Respondent's claims fall squarely within the terms of this broad arbitration clause. Not only are they covered by the provision's reference to "all disputes … related to employment, employment termination, or post-employment-related claims," but they are encompassed in the more specific list of arbitrable claims. For these reasons, the Court finds that the Solution Channel Agreement encompasses Respondent's claims, and that the agreement is applicable to the parties' underlying dispute.[8]

---

[8] The Court recognizes that another court in this District, when considering whether to compel arbitration pursuant to the very same agreement, and facing parties who disagreed as to whether the claims at issue were covered under the agreement, found that the parties had delegated the authority to decide such questions of arbitrability to the arbitrator. *See Torre* v. *Charter Commc'ns, Inc.*, No. 19 Civ. 5708 (JMF), 2020 WL 1048933, at *1 (S.D.N.Y. Mar. 4, 2020). In particular, the court observed: "The Arbitration Agreement defines 'Covered Claims' to include 'all disputes related to the arbitrability of any claim or controversy.' And were there any doubt, it elsewhere provides unambiguously that 'the arbitrator shall have the sole authority to determine whether a particular claim or controversy is arbitrable.'" *Id.* (internal citations omitted). (*See also* Solution Channel Agreement ¶¶ B.3, I.1). Here, in contrast, the parties do not dispute that Respondent's claims against Petitioner fall
within the scope of the Solution Channel Agreement — rather, their dispute pertains to the agreement's validity and enforceability. While the Court's view is that the Solution Channel Agreement is applicable to the parties' underlying dispute, it forewarns that any future disagreements as to the scope of the claims subject to arbitration will need to be resolved by an arbitrator.

28

3.      **The Arbitrator Must Decide Venue**

Both parties have indicated their willingness to arbitrate before JAMS

pursuant to the JAMS Agreement.  However, they continue to dispute whether,

in the first instance, Respondent is required to arbitrate her claims before the

AAA under the Solution Channel Agreement.  The Court must refer the parties

to an arbitrator to determine, if necessary, where Plaintiff's claims are to be

arbitrated.

Under New York law, a subsequent agreement must establish the parties'

intent "to revoke retroactively their contractual obligations to submit disputes

arising" under an earlier arbitration agreement.  *Primex Int'l Corp.* v *Wal-Mart*

*Stores*, 89 N.Y.2d 594, 599 (1997).  The Solution Channel Agreement provides:

"This Agreement sets for the complete agreement of the parties on the subject

of resolution of the covered disputes, and supersedes any prior or

contemporaneous oral or written understanding on this subject[.]"  (Solution

Channel Agreement ¶ P).  In sum, the Solution Channel Agreement:

(i) encompasses the disputes covered by the JAMS Agreement (*compare* JAMS

Agreement 1, *with* Solution Channel Agreement ¶ B.1); (ii) provides that it

contains the "complete agreement of the parties on ... the covered disputes"

(Solution Channel Agreement ¶ P); and (iii) states that it supersedes any prior

arbitration agreements between the parties (*id.*).

However, the Court recognizes that in similar circumstances, it has

declined to reach the issue of whether a subsequent arbitration agreement

"functions to supersede or terminate" a prior arbitration agreement, on the

grounds that this is an issue for the arbitrator to resolve.  *See Winter Investors, LLC* v. *Panzer*, No. 14 Civ. 6852 (KPF), 2015 WL 5052563, at *8, 10 (S.D.N.Y. Aug. 27, 2015) (collecting cases holding that, *inter alia*, an arbitrator decides issues such as expiration and termination).  In *Winter Investors*, like here, the Court was faced with one agreement calling for arbitration before the AAA, and a second agreement requiring arbitration before JAMS.  *Id.* at *9.  The Court further declined to require the parties to arbitrate before either forum.  *Id.* at *10.  The Court reasoned that where "the question to be resolved is not '*whether* to proceed by arbitration, but *which arbitration panel* should decide certain issues," such question is not for the Court to decide.  *Id.* (quoting *UBS Fin. Servs., Inc.* v. *W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 655 (2d Cir. 2011)); *see also UBS Fin. Servs., Inc.*, 660 F.3d at 655 ("[V]enue is a procedural issue that … arbitrators should address in the first instance, and that the District Court lacked subject matter jurisdiction to resolve[.]").  The Court sees no reason to depart from its prior approach.  While it finds that Respondent's claims against Petitioner must be arbitrated, the venue of such arbitration is outside the bounds of the instant motion.

### 4.    The Arbitration Should Not Be Stayed

Respondent asks that the Court refrain from deciding the Petition pending appellate review of cases currently before the Second Circuit and the Appellate Division of the New York Supreme Court.  (Resp. Opp. 10-11 (referencing *Newton* v. *LMVH Moët Hennessy Louis Vuitton Inc.*, Index No. 154178/2019, 2020 WL 3961988 (N.Y. Sup. Ct. July 10, 2020); *Tantaros* v. *Fox*

*News Network, LLC*, 465 F. Supp. 3d 385 (S.D.N.Y. 2020), *appeal docketed*, No. 20-3413, Dkt. #1 (2d Cir. Oct. 6, 2020))).  Further, Respondent argues that the Court should permit this matter and the Underlying Action to proceed to discovery pending the appellate courts' review, in what she submits would be in the interest of efficiency and conservation of resources (though the Court questions whether allowing such discovery during the appeals' pendency would further resource conservation).  (*Id.* at 11-13).  As to be expected, Petitioner disagrees that *Newton* and *Tantaros* provide any basis for staying the Court's decision.  (Pet. Reply 8-9).

Specifically, Respondent asks that the Court defer its decision until there is greater clarity from other courts as to whether Section 7515 of the New York Civil Practice Law and Rules preempts the FAA.  Section 7515(b)(i) provides that "[e]xcept where inconsistent with federal law" no written contracts can contain certain prohibited clauses, N.Y. C.P.L.R. § 7515(b)(i), defined as "any clause or provision in any contract which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination, in violation of laws prohibiting discrimination," *id.* § 7515(a)(2).  Section 7515(b)(iii) states that such prohibited mandatory arbitration clauses are "null and void" "[e]xcept where inconsistent with federal law."  *Id.* § 7515(b)(iii).

Section 7515, which became effective on July 11, 2018, initially applied to sexual harassment claims only, but was amended, effective October 11,

2019, to expand the prohibition on mandatory arbitration with respect to all forms of unlawful discrimination.  Since its enactment, a number of courts in New York and the Second Circuit have considered the interplay between Section 7515 and Section 2 of the FAA, the latter of which provides that "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  And several courts in this District have found that Section 7515 is preempted by the FAA.  *See, e.g.*, *Gilbert* v. *Indeed, Inc.*, No. 20 Civ. 3826 (LJL), 2021 WL 169111, at *13-15 (S.D.N.Y. Jan. 19, 2021); *White* v. *WeWork Cos.*, No. 20 Civ. 1800 (CM), 2020 WL 3099969, at *5 (S.D.N.Y. June 11, 2020); *Latif* v. *Morgan Stanley & Co.*, No. 18 Civ. 11528 (DLC), 2019 WL 2610985, at *3-4 (S.D.N.Y. June 26, 2019).  However, there is one contrary decision by a New York State trial court, currently pending appellate review.  *See Newton,* 2020 WL 3961988.

Though Respondent does not specify the potential import of the appeal in *Newton*, the Court understands her to be suggesting that her arbitration agreements with Petitioner may be null and void under Section 7515, should Section 7515 be found not to be preempted by the FAA.  Respondent does not ask the Court to reach its own conclusion on this issue, but rather, to refrain from making a determination until the state appellate court has done so.  (Resp. Opp. 9-10).  However, given that several courts in this District have

reached this issue, and have determined that Section 7515 is preempted by the FAA, the Court is disinclined to stay its decision on this basis.  In particular, the Court observes that following the decision in *Newton*, Judge Liman addressed Section 7515's impact on the FAA and determined that *Newton* was "not persuasive."  *Gilbert*, 2021 WL 169111, at *15.  In a well-considered opinion that recounted both the FAA's legislative history and the Supreme Court's body of cases interpreting its scope, Judge Liman determined that "regardless of the intent of the New York legislature," Section 7515 could not be applied "to relieve Plaintiff from the effect of her arbitration agreement even as to her state claims."  *Id.* at *12-15.  The Court agrees with Judge Liman and sees no grounds for staying its decision pending the Appellate Division's review of *Newton*.

Respondent also asks that the Court stay its decision pending the Second Circuit's review of *Tantaros*, 465 F. Supp. 3d 385.  (Resp. Opp. 11). However, Respondent mischaracterizes the issue in *Tantaros* as "whether the prohibition on mandatory arbitration clauses contained in CPLR § 7515 conflicts with the FAA."  (*Id.*).  In fact, *Tantaros* considered a jurisdictional issue: whether the case required remand to state court for lack of subject matter jurisdiction based on the question of "whether a claim arising under § 7515 necessarily raises a federal question within the original jurisdiction of this Court pursuant to 28 U.S.C. § 1331."  465 F. Supp. 3d at 389.  Here, where both the Petition and Underlying Action have been brought before the Court pursuant to its diversity jurisdiction (*see* Petition ¶ 22; 20 Civ.

33

7050 Dkt. #1 at ¶¶ 7-8), and Plaintiff has not moved to remand the case to state court, or otherwise questioned the Court's jurisdiction, the Court's view is that further developments in the *Tantaros* action are unlikely to have any bearing on the cases before this Court.  As such, Respondent has provided no basis for awaiting the outcome of the appeal before the Second Circuit.

### 5.    This Case Is Stayed Pending Arbitration

The Court must next decide whether to dismiss or stay the action.  When all claims have been referred to arbitration and a stay is requested, the Court must grant the stay.  *See Katz* v. *Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015).  However, when a stay is not requested, the district court has discretion in determining whether to stay or dismiss the case pending arbitration.  *See Benzemann* v. *Citibank N.A.*, 622 F. App'x 16, 18 (2d Cir. 2015) (summary order) (concluding that district court was not required to enter a stay where parties did not request one); *see also Castellanos* v. *Raymours Furniture Co., Inc.*, 291 F. Supp. 3d 294, 302 (E.D.N.Y. 2018) ("Although defendant's motion requests that the Court dismiss the action, the Court concludes that a stay is appropriate.").

Here, Petitioner has not requested either a stay or a dismissal of this action.  (*See generally* Pet. Br.; Pet. Reply).  Following *Katz*, courts in this Circuit regularly stay, rather than dismiss, complaints subject to an arbitration agreement.  *See, e.g.*, *TIG Ins. Co.* v. *Am. Home Assurance Co.*, No. 18 Civ. 10183 (VSB), 2020 WL 605974, at *4 (S.D.N.Y. Feb. 7, 2020); *Porcelli* v. *JetSmarter, Inc.*, No. 19 Civ. 2537 (PAE), 2019 WL 2371896, at *4 (S.D.N.Y.

June 5, 2019); *Crawley* v. *Macy's Retail Holdings, Inc.*, No. 15 Civ. 2228 (KPF), 2017 WL 2297018, at *6 (S.D.N.Y. May 25, 2017).  As the Second Circuit has observed, a stay permits the parties to move their dispute "out of court and into arbitration as quickly and easily as possible."  *Katz*, 794 F.3d at 346.  A stay would also allow the Court, at a later stage, to address any claim or lingering issue that is not resolved in arbitration.  *See Zambrano* v. *Strategic Delivery Sols., LLC*, No. 15 Civ. 8410 (ER), 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016).  Accordingly, the Court stays the action pending arbitration of Respondent's claims.

**6.    The Underlying Action Remains Stayed**

Respondent asks that if arbitration is compelled, it is done so pursuant to the JAMS Agreement, so that Respondent may proceed against the Individual Defendants in the Underlying Action.  (Resp. Opp. 13).  As discussed above, an arbitrator must decide whether the parties are to proceed pursuant to the Solution Channel Agreement or the JAMS Agreement.  As the latter agreement is limited to claims against Petitioner, and is silent as to claims against Petitioner's employees, the determination as to which agreement controls may well resolve whether Respondent is required to arbitrate her claims against the Individual Defendants.  This counsels in favor of staying the Underlying Action under Section 3 of the FAA, which provides that where the claims pending before a court are "referable to arbitration," the court "shall ... stay the trial of the action" until the parties arbitrate the dispute.  9 U.S.C. § 3.

35

Moreover, "[a] trial court may, with propriety, ... enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Maritima de Ecologia, S.A. de C.V.* v. *Sealion Shipping Ltd.*, No. 10 Civ. 8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011) (quoting *Admin. Comm. of the Time Warner, Inc. Benefit Plans* v. *Biscardi,* No. 99 Civ. 12270 (DLC), 2000 WL 565210, at *1 (S.D.N.Y. May 8, 2000)).  This falls within a district court's inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Id.* (quoting *WorldCrisa*, 129 F.3d at 76).  And courts have found that stays are warranted where an arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration.  *See, e.g., Maritima de Ecologia, S.A. de C.V.*, 2011 WL 1465744, at *5 (finding that stay was appropriate where the arbitration "will have a significant bearing on this case"); *see also Bear, Stearns & Co.* v. *1109580 Ont., Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (observing that under certain conditions, "[a]n arbitration decision may effect collateral estoppel in a later litigation or arbitration if the proponent can show with clarity and certainty that the same issues were resolved" (internal quotation marks omitted)).  Here, should the arbitrator refrain from resolving Respondent's claims against the Individual Defendants, the issues they will decide in resolving the claims against Petitioner "overlap significantly (if not entirely)" with the issues the Court would need to reach to adjudicate the claims against the Individual Defendants in the Underlying Action.  *See Winter*

*Investors, LLC*, 2015 WL 5052563, at *12.  Accordingly, the Underlying Action must remain stayed.

## CONCLUSION

For the reasons stated in this Opinion, the Petition to compel arbitration is GRANTED.  The Clerk of Court is ORDERED to terminate the motion at docket entry 1 and to STAY this case.  In a separate Order, the Court will confirm the stay of the Underlying Action.

The parties are ORDERED to update the Court on or before June 23, 2021, regarding the status of any arbitration.

SO ORDERED.

Dated:      February 23, 2021
            New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge